IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 10-cv-00722-MSK-MJW

ALLEN GRIDER;
GLENN BELCHER; and
VALERIE PILTZ,

        Plaintiffs,

v.

CITY AND COUNTY OF DENVER;
DOUG KELLEY, as an individual and in his official capacity; and
CITY OF AURORA,

        Defendants.

---

## OPINION AND ORDER GRANTING MOTION TO DISMISS, GRANTING LEAVE TO REPLEAD, AND SUSTAINING OBJECTIONS TO MAGISTRATE JUDGE'S ORDER

---

**THIS MATTER** comes before the Court pursuant to Defendants City and County of Denver ("Denver") and Doug Kelley's Motion to Dismiss **(# 31)**, the Plaintiffs' response **(# 45)**, and Denver and Mr. Kelley's reply **(# 57)**; Defendant City of Aurora's ("Aurora") Motion for Judgment on the Pleadings **(# 39)**, the Plaintiffs' response **(# 45)**, and Aurora's reply **(# 56)**; and the Plaintiffs' Objections **(# 71)** to the October 25, 2010 Order **(# 67)** of the Magistrate Judge granting Aurora's Motion to Disqualify **(# 52)** the Plaintiffs' counsel, Aurora's response **(# 78)**, and the Plaintiffs' reply **(# 79)**.

1

## FACTS

According to the Complaint (**# 5**), both Denver and Aurora have promulgated municipal ordinances that prohibit any person from keeping, possessing, or transporting specified breeds of dogs, including pit bulls,[1] within city limits.  Each of the named Plaintiffs are individuals who, for purposes of these motions, the parties agree are qualified individuals with disabilities, as that term is defined in the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Each of the Plaintiffs uses a trained service dog to assist them in overcoming the limitations caused by their disabilities.  Each of the Plaintiffs' service dogs are pit bulls.

Mr. Grider, a resident of Aurora, has had a pit bull as his service dog since 2003.  In 2009, Aurora Animal Control officials impounded the dog, releasing it only upon Mr. Grider's agreement to transfer possession of the dog over to a friend who lived outside Aurora.  Mr. Grider contends that, without the assistance of his service dog, his disability prevents him from accessing programs and services offered by Aurora.

Mr. Belcher also uses a pit bull as a service dog.  In 2009, Mr. Belcher moved to Denver, only to discover the municipal ordinance banning pit bulls.  The Complaint does not specifically identify what steps Mr. Belcher took in response to this discovery, but one can infer from the

---

[1]Both cities' ordinances define "pit bull" as "any dog that is an American Pit Bull Terrier, American Staffordshire Terrier, Staffordshire Bull Terrier, or any dog displaying the majority of physical traits of one or more of the above breeds, or any dog exhibiting those distinguishing characteristics which substantially conform to the standards established by the American Kennel Club or United Kennel Club for any of the above breeds."

Aurora's ordinance also applies to "restricted breed[s] of dog," which is defined to include "Any American Bulldog (Old Country Bulldog), Dogo Argentino, Canary Dog (Canary Island Dog, Presa Canario, Perro De Presa Canario), Presa Mallorquin (Pero De Presa Mallorquin, Ca De Bou), Tosa Inu (Tosa Fighting Dog, Japanese Fighting Dog, Japanese Mastiff), Cane Corso (Cane Di Macellaio, Sicilian Branchiero), Fila Brasileiro, or any dog displaying the majority of the physical traits of any one or more of the above breeds."

allegations in the Complaint that Mr. Belcher no longer possesses the dog.  Mr. Belcher contends that, without the assistance of the dog, his disability prevents him from accessing services and programs provided by Denver.

Ms. Piltz employs the services of two service dogs, both of whom are pit bulls.  In March 2010, Ms. Piltz sought to serve as a judge at a dog show that was held in Aurora.  Ms. Piltz intended to stay with her sister, who resides in Denver.  Ms. Piltz contacted animal control officials in both Denver and Aurora about her situation.  Aurora indicated that it would waive the operation of the ordinance for Ms. Piltz during her stay, so long as her dogs remained muzzled. Denver, acting through Mr. Kelley, Director of Denver Animal Control, refused Ms. Piltz' request for a waiver.  Mr. Kelley stated to Ms. Piltz that "unless [she] is blind or deaf, according to the ADA," should would not be permitted to bring the dogs to Denver.

The Plaintiffs' Complaint asserts two claims for relief: (i) violation of Title II of the ADA, in that enforcement of the ordinances exclude persons with disabilities from participating in public services or programs; and (ii) a "claim" for injunctive relief, seeking a permanent injunction allowing the Plaintiffs to maintain possession of their service dogs in Denver and Aurora.

## JURISDICTION AND ISSUES PRESENTED

The Court's jurisdiction over this matter arises pursuant to 28 U.S.C. § 1331, as the matter involves interpretation of a federal statute, the ADA.

The sole issue before the Court on both Denver and Aurora's motions is whether, pursuant to Fed. R. Civ. P. 12(b)(6), the Complaint sufficiently pleads a claim of disability discrimination under 42 U.S.C. § 12132.  In identifying the narrow scope of this issue, the Court

pauses to caution that it is <u>not</u> deciding or considering numerous other, more contentious issues. The Court does not address or express any opinion as to the circumstances cited by Denver and Aurora as justifying their ordinances, the wisdom or public policy foundations for ordinances restricting the possession of pit bulls or other breeds of dogs, or disputes about the ability of municipalities to objectively and reliably apply those ordinances.  Once again, the Court emphasizes that it is only considering whether the Plaintiffs have alleged facts sufficient to support each of the necessary elements of their ADA claim.

Separately, the Plaintiffs object, pursuant to Fed. R. Civ. P. 72(a), to a ruling by the Magistrate Judge disqualifying them from further representation of the Plaintiffs.  The Magistrate Judge concluded that counsel are likely to be called as witnesses in this action.  The question presented to this Court is whether the Magistrate Judge's ruling was clearly erroneous or contrary to law.

## ANALYSIS

### A.  Motion to Dismiss/Judgment on the Pleadings

Denver and Mr. Kelley move **(# 31)** to dismiss the substantive Title II claim pursuant to Fed. R. Civ. P. 12(b)(6), arguing: (i) the Plaintiffs have not adequately alleged that Denver's ordinance denies them access to city programs and services because they do not allege that they were using their service dogs prior to the date that the ordinance was drafted, because their pit bulls do not "provide services which no other service animal can provide," and because any denial of access to public services is "solely caused by their preference to use a pit bull as a service dog"; (ii) the Plaintiffs' request for a modification of the ordinance to permit categorical exceptions to the ordinance for pit bulls used as service animals is unreasonable; and (iii) the

4

claim against Mr. Kelley should be dismissed because Title II of the ADA does not contemplate individual liability.

Aurora moves **(# 39)** for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), effectively adopting the same arguments put forward by Denver and Mr. Kelley.

    1.  Standard of review

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party. *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). The Complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Benefield v. McDowall,* 241 F.3d 1267, 1270 (10th Cir. 2001); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). The Court must limit its consideration to the four corners of the Amended Complaint, any documents attached thereto, and any external documents that are referenced in the Amended Complaint and whose accuracy is not in dispute. *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

In *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court clarified what constitutes a "well-pleaded fact" for purposes of a Rule 12 analysis. A pleader is not required to set forth "detailed factual allegations," but must offer more than "labels and conclusions," a "formulaic recitation of the elements of a cause of

5

action," or "naked assertions devoid of further factual enhancement." *Iqbal*, 129 S.Ct. at 1949.

The cases make clear that it is <u>facts</u>, not conclusions, that must be pled; "the tenet that a court

must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions," including "legal conclusion[s] couched as a factual allegation." *Id.* at 1949-50.

Moreover, the facts pled must demonstrate a "plausible" claim, that is, one in which the pleader

has shown more than just an abstract "possibility" that the defendant has engaged in actionable

misconduct.[2] *Id.* One way in which the Court might conduct its analysis is to "identify[ ]

pleadings that, because they are no more than conclusions, are not entitled to the assumption of

truth," and disregard them. Then, faced with only well-pleaded factual allegations, the Court

"should assume their veracity and then determine whether they plausibly give rise to an

entitlement to relief." *Id.* at 1950.

　　　The Court analyzes motions for judgment on the pleadings under Fed. R. Civ. P. 12(c)

according to the same standards as a motion under Rule 12(b)(6). *Park University Enterprises,*

*Inc. v. American Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006).

---

　　　[2]The Supreme Court took pains to ensure that the word "plausible" is understood to mean
that the plaintiff has a demonstrable and concrete belief that a wrong has been committed and the
defendant is the person responsible, as opposed to a set of facts in which a wrong might possibly
and hypothetically be ascertained, and the defendant might, hypothetically, be a person who
might have been responsible for that wrong. For example, in *Twombly*, the Court observed that
the plaintiff in an antitrust case had sufficiently pled as a fact that two defendants had engaged in
"parallel behavior." However, it found that while parallel conduct <u>might</u> be consistent with the
required element of an agreement between the two defendants, "it was not only compatible with,
but indeed was more likely explained by, lawful unchoreographed free-market behavior." 550
U.S. at 567. Thus, "the well-pleaded fact of parallel conduct, accepted as true, did not plausibly
suggest an unlawful agreement." *Id.* at 570.
　　　Cases such as *Twombly* and *Iqbal* make clear that the "plausibility" requirement is not an
invitation to this Court to speculate as to whether well-pleaded facts alleged by the pleader are
likely to be proven true or not. In this sense, "plausible" is not the synonym of "believable."

## 2. Types of ADA claims

The Court first turns to the statutory context in which the Plaintiffs' substantive claim arises. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[3] 42 U.S.C. § 12132. Courts have construed this statute to authorize several different types of ADA claims: (i) those brought under an intentional discrimination (or "disparate treatment") theory; (ii) those brought under a disparate impact theory; and (iii) those brought under a "failure to accommodate' theory. *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009); *Wisconsin Community Serv's., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006); *Crowder v. Kitagawa*, 81 F.3d 1480, 1483 (9th Cir. 1996). None of the parties have attempted to precisely delineate the contours of the Plaintiffs' claim, and thus, the Court undertakes to do so.

### a. Disparate treatment claim

The disparate treatment theory typically requires a showing that a municipality took a particular action based on a purposeful intent to discriminate against persons on the basis of their disabilities. *Quad Enterprises Co. v. Town of Southold*, 369 Fed.Appx. 202, 207 (2d Cir. 2010) (unpublished). The Plaintiffs in this case do not appear to be pursuing such a theory, as they do not allege that Denver or Aurora purposefully drafted the ordinances in question with a purposeful intent to deprive disabled persons of the ability to enjoy public services. The ordinances in question are facially-neutral, applying equally to disabled persons and non-

---

[3]The parties agree that Denver and Aurora are "public entities" and that the Plaintiffs are all "qualified individual[s] with a disability," as those terms are defined by the ADA. 42 U.S.C. § 12131.

disabled persons alike.  Thus, the Court presumes that the Plaintiffs are not pursuing a disparate treatment theory.

> b. Disparate impact claim

An ADA claim based on a disparate impact theory requires a plaintiff to allege: (i) the existence and application of a facially-neutral practice; and (ii) that the neutral application of that practice nevertheless has a significantly disproportionate adverse impact upon disabled persons. *Id.* at 205, *citing Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565, 574-75 (2d Cir. 2003). Upon such a showing, the burden of proof shifts to the defendant to show that the practice furthered a legitimate governmental interest and that no alternative would serve that interest with less discriminatory effect.  *Tsombanidis*, 352 F.3d at 575.  A reasonable construction of the Plaintiffs' Complaint suggests that the Plaintiffs might be pursuing a disparate impact theory of this type, as they may be contending that the facially-neutral ordinances have a disproportionate effect on disabled persons' abilities to access public services as compared to the impact the ordinance has on non-disabled persons.

A plaintiff purporting to assert a disparate impact claim faces a formidable pleading burden.  In order to show that the challenged policy has a "significantly adverse or disproportionate impact" on a protected group, the plaintiff is usually required to adduce statistical evidence demonstrating the degree of disparity between the policy's impact on disabled persons and the policy's impact on non-disabled persons.  *Id.* at 575-76.  Although there may be cases in which the degree of disparity can be shown through means other than statistics, the plaintiff must nevertheless identify some "analytical mechanism to determine disproportionate impact."  *Id.* at 576.  A simple, anecdotal showing that the disabled Plaintiffs

themselves were affected by the policy is not enough to satisfy this requirement. *Id.*

Here, the Plaintiffs have not plead facts, statistical or otherwise, regarding the extent to which the challenged ordinances disproportionately affect disabled persons relative to non-disabled persons. They have not, for example, purported to identify the number of disabled persons living in or visiting Denver or Aurora who would be affected by the ordinances (*i.e.* disabled persons who rely exclusively on service dogs of the restricted breeds in order to access public services), nor identified the number of non-disabled individuals whose ability to avail themselves of those services are affected by the ordinances. The anecdotal allegations of the three Plaintiffs themselves is not a sufficient substitute for the fairly rigorous mathematical showing that is necessary to plead a disparate impact case. Thus, to the extent the Plaintiffs intend to assert an ADA claim premised on disparate impact, they have failed to plead the facts necessary for such a claim.

c. Failure to accommodate claim

Both the text of the ADA itself and the authorities interpreting it agree that the statute includes an obligation for public entities to reasonably accommodate disabled individuals. *See generally Henrietta D. v. Bloomberg*, 331 F.3d 261, 273-76 (2d Cir. 2003), *citing Alexander v. Choate*, 469 U.S. 287, 300-01 (1985); 42 U.S.C. § 12131(2) (defining "qualified individual with a disability" as one who "with or without reasonable modifications to rules, policies, or practices . . ." is eligible to participate in public services) (emphasis added). Courts have recognized that a claim implicating the public entity's failure to make reasonable accommodation of disabled people is a freestanding claim which does not require a showing of either the discriminatory state of mind of the disparate treatment claim or the class-based evidence of disparate impact. *Id.* at

9

276-77.

Thus, the failure to accommodate claim requires plaintiffs to allege (in addition to the parties' status as qualified individuals with disabilities and public entities): (i) that they are facially entitled to public benefits which are also available to similarly-situated persons without disabilities; (ii) that they require a reasonable accommodation in order for them to meaningfully access those benefits; and (iii) the public entity has refused to provide them with such a reasonable accommodation. *Id.* at 280. Although the facts that must be alleged to satisfy the second element – the need for a reasonable accommodation that would allow meaningful access to the benefits – is "not a heavy one," the plaintiff must nevertheless identify a "plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Id.* at 280. If the plaintiffs carry their burden, the public entity bears the burden of showing that the requested accommodation is unreasonable in some way – *e.g.* that it would "fundamentally alter the nature of the activity" in question, or that it would "impose an undue hardship." *Id.* at 281.

A failure to accommodate theory most closely fits the allegations in the Complaint here, but even with regard to this type of claim, the Complaint is deficient. As to the first element, the Plaintiffs have not specifically identified the particular public services that they are entitled to use but have been unable to access as a result of the application of the ordinances. Each of the Plaintiffs assert, in completely conclusory fashion, that they were "denied access" or "prevented from utilizing" unspecified "programs and services offered by a public entity," *Docket* # 5, ¶ 31, 40, 45, but none of the Plaintiffs identify the <u>particular</u> programs or services they were

prevented from using.[4]  As *Ashcroft* and *Iqbal* instruct, these conclusory recitations of the

statutory language are insufficient to carry the Plaintiffs' burden of pleading <u>facts</u> sufficient to

satisfy the elements of the claim.

In addition, the Plaintiffs do not clearly identify the particular reasonable accommodation

they seek, as required by the second element of the claim.  In some portions of the Complaint,

the Plaintiffs appear to contend that complete revocation of the ordinances is the requested

accommodation.  *See Docket* # 5 at ¶ 61 ("If Defendants' breed bans were not in place, the

Plaintiffs . . . would not be suffering"); ¶ 62 ("if Defendants revoke their breed bans . . .

Plaintiff's injuries will be redressed").  In other places, the Plaintiffs appear to propose an

unspecified and conclusory "reasonable modification for service animals," *id.* at ¶ 62, 74,

without identifying what that modification might be.  Another portion of the Complaint

_____

[4]In paragraph 68, the Plaintiffs make an unspecified allegation that they "are unable to access public libraries, courthouses, and parks."  Assuming these are public services that the Plaintiffs are entitled to access, it is entirely unclear how the services provided by the Plaintiffs' dogs would relate to the Plaintiffs' ability to avail themselves of these particular services.

The Complaint alleges that Mr. Grider's dog is trained to "enter rooms and buildings ahead of [him] and alert him if anyone else is present in the room" and to "alert [him] when another individual enters the room."  Such assistance would be useless in a public park, which has no rooms, and of dubious assistance in libraries or courthouses, where one would reasonably expect that most rooms Mr. Grider visits would be occupied by other persons and that people would be frequently entering and leaving such rooms.

Mr. Belcher's dog assists him in "maintaining his balance, . . . maneuvering stairs and uneven surfaces, and carrying objects."   It is not clear how Mr. Belcher's need for canine assistance in "carrying objects" prevents him from using the services of parks, libraries, and courthouses, and his need for assistance in "maintaining balance" and "maneuvering stairs and uneven surfaces" does not address whether the libraries, parks, and courthouses he seeks to use have such "stairs and uneven surfaces" or other features that affect his ability to maintain his balance.

Ms. Piltz's dog provides unspecified "mobility [and] mental health support."  This completely conclusory assertion gives no indication how Ms. Piltz's inability to use her dog prevents her from using libraries, parks, and courthouses.

references the municipalities "grant[ing] an exemption for [the Plaintiffs'] service dogs," *id.* at ¶ 69, or "creating an exemption for ADA service animals," *id.* at ¶ 72, but again, the specific nature of this proposed accommodation is not identified.  Putting aside the fact that the Complaint gives no indication which of these accommodations is the one the Plaintiffs contend is necessary to allow them to access public services, in no instance have the Plaintiffs plead facts showing that the proposed accommodation is "reasonable," in that its facial costs do not exceed its benefits.  At best, paragraph 72 of the Complaint offers only the conclusory assertion that "an exemption for ADA service animals" would not "cause an undue burden."[5]  The absence of factual allegations regarding the costs and benefits of such an exemption make this conclusory statement insufficient to carry the Plaintiffs' pleading burden.

Accordingly, the Court finds that the Plaintiffs have failed to allege facts sufficient to state a failure to accommodate claim.

### d. Leave to replead

Although the instant Complaint fails to state sufficient facts to support an ADA claim under any of the theories, it seems likely that the Plaintiffs can cure these deficiencies by more considered repleading.  Fed. R. Civ. P. 15(a) contemplates that leave to replead shall be "freely

---

[5]A careful reading of the subsequent paragraph in the Complaint actually suggests that the costs of this contemplated "exemption" might actually be significant.  Paragraph 73 acknowledges that outright bans of certain breeds are "used to avoid a case-by-case analysis of dogs that may have a biological propensity toward aggressive behavior." (The Plaintiffs then suggest that the training that service dogs undergo reduces any such "biological propensity toward aggressive behavior," rending trained services dogs "no more of a threat than the average dog.")  However, an proposed accommodation allowing "exemptions" to the ordinances for trained service dogs might require the municipalities to then undertake the very "case-by-case analysis" of the dangerousness of individual dogs for whom exemptions are sought – the very "case-by-case analysis" that, the Plaintiffs concede, the ordinances were drafted in an attempt to avoid.

granted," and this Court can ascertain no prejudice that will result to the Defendants if repleading is permitted.[6]  Accordingly, the Plaintiffs shall have 30 days within which to file an Amended Complaint that cures the defects noted above and pleads sufficient facts to state one or more ADA claims.

　　　　　3.　Claims against Mr. Kelley

Mr. Kelley separately seeks dismissal of the claims asserted against him on the grounds that ADA claims under Title II do not permit individual liability.  The caption of the case indicates that the claims against Mr. Kelley are asserted in both his individual and official capacities.

To the extent claims are asserted against Mr. Kelley in his official capacity, those claims are, in effect, claims asserted against the entity Mr. Kelley directs – Denver Animal Control.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).  The Court assumes that the claims against Denver itself are identical to the claims that could be asserted against Denver Animal Control, making any claims against Mr. Kelley in his official capacity redundant.  Accordingly, the claims against Mr. Kelley in his official capacity are dismissed.

---

[6]The Court has intentionally declined to address Denver's arguments at this time, as those arguments tend to be factually-intensive and unsuitable for resolution on a motion at the pleadings stage.  For example, the Defendants contend that the Plaintiffs are only entitled to <u>any</u> reasonable accommodation the Defendants might offer, not necessarily the particular reasonable accommodation the Plaintiffs request.  To address this argument, the Court must be able to ascertain precisely what accommodation(s) the Plaintiffs sought and what accommodation(s) the Defendants offered.  As noted above, the four corners of the instant Complaint do not clearly reveal the particular accommodation(s) requested by the Plaintiffs, and (with the exception of Aurora offering to waive the ordinance as to Ms. Piltz) makes no mention whatsoever of accommodation(s) offered by the Defendants.  As a result, the Defendants' argument would require the Court to look beyond the facts stated in the Complaint, something that it cannot do on a Rule 12 motion.

To the extent that claims are asserted against Mr. Kelley in his individual capacity, no

individual liability lies against individuals for violations of rights secured by Title II of the ADA.

*Montez v. Romer*, 32 F.Supp.2d 1235, 1240-41 (D. Colo. 1999).  The Plaintiffs have not come

forward with authority to the contrary, nor even addressed Mr. Kelley's argument for dismissal

of the claims against him.  Accordingly, all claims against Mr. Kelley are dismissed.

### B.  Objections to Magistrate Judge's Order

Prior to this action, the Aurora Deputy City Attorney and the Plaintiffs' counsel had

several conversations attempting to reach an agreement that would allow Mr. Grider to retain his

dog, and Aurora contends that those conversations are relevant to the question of whether Aurora

offered a reasonable accommodation to Mr. Grider.  As a result, Aurora moved to disqualify **(#**

**52)** the Plaintiffs' counsel from continued representation, arguing that the Plaintiffs' attorneys

were necessary witnesses in this action with regard to attempts that Aurora made to

accommodate Mr. Grider.   The Court referred Aurora's motion to the Magistrate Judge pursuant

to Fed. R. Civ. P. 72(a).  By Order dated October 25, 2010 **(# 67)**, the Magistrate Judge granted

Aurora's motion.

Specifically, the Magistrate Judge noted Colorado law (adopted by this Court through

D.C. Colo. L. Civ. R. 3.7(a)) that prohibits a lawyer from representing clients in an action where

the lawyer is likely to be a necessary witness; that the rule applies where "no other witness or

documentary evidence could testify or be used" to establish the disputed fact; and noted that the

burden of proof is on the movant to show that the attorney's testimony is relevant, material, and

otherwise unattainable.  The Magistrate Judge noted that the question of whether and to what

extent Aurora offered to accommodate Mr. Grider is a contested issue in the case, and that the

Aurora Deputy City Attorney and the Plaintiffs' counsel were key witnesses with regard to this issue, as there was no specific documentary evidence or third-party witnesses would could recount the discussions concerning accommodation.  The Magistrate Judge also rejected an argument that discussions concerning Mr. Grider was precluded by Fed. R. Evid. 408(a)(2), on the grounds that Aurora was not using the conversations to establish liability.  As a result, the Magistrate Judge disqualified the Plaintiffs' counsel and directed that the Plaintiffs retain new counsel or indicate their intention to proceed *pro se*.

The Plaintiffs filed timely Objections **(# 71)** to the Magistrate Judge's Order, arguing: (i) they were not afforded a full opportunity to be heard, insofar as the Magistrate Judge failed to conduct an evidentiary hearing, and that they would have produced witnesses and evidence at a hearing that would refute findings made by the Magistrate Judge; (ii) the Magistrate Judge improperly shifted the burden of proof to the Plaintiffs, noting that "the Plaintiffs have failed to produce documentary evidence or specific witnesses"; (iii) the Magistrate Judge did not indulge the strong preference against disqualification; (iv) a stipulation as to the discussions concerning Mr. Grider could have alleviated the need for disqualification; (v) the circumstances of this case did not warrant disqualification; (vi) the discussions were required by the Court's Local Rules and Practice Standards; (vii) the discussions are inadmissible under Fed. R. Evid. 408; and (viii) outright disqualification works an extreme hardship on the Plaintiffs and a lesser remedy, such as one that allows the Plaintiffs' counsel to continue to work on pretrial preparation is appropriate.

      1.  <u>Standard of review</u>

Because the underlying motion is not dispositive of a claim or defense, the Court considers whether the Magistrate Judge's ruling is "clearly erroneous or contrary to law" under

Fed. R. Civ. P. 72(a).  *See also* 28 U.S.C. § 636(b)(1)(A); *Hutchinson v. Pfeil*, 105 F.3d 562, 566

(10th Cir. 1997); *Ariza v. U.S. West Communications, Inc.*, 167 F.R.D. 131, 133 (D. Colo. 1996).

Accordingly, the Plaintiffs' Objections will be overruled unless the Court finds that the

Magistrate Judge abused his discretion or, if after viewing the record as a whole, the Court is left

with a "definite and firm conviction that a mistake has been made." *Ariza,* 167 F.R.D. at 133,

*citing Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1464 (10th Cir.1988).

      2.  Ripeness

      Having considered the parties' briefing on the underlying motion, the transcript of the

oral argument, the Magistrate Judge's Order, and briefing on the Plaintiffs' Objections, this

Court has concluded that the Magistrate Judge addressed the issue prematurely.

      At bottom, a motion to disqualify an attorney who has personal knowledge about the

facts in dispute is one that anticipates the attorney being called as a witness at trial.  *Morganroth*

*& Morganroth v. DeLorean*, 213 F.3d 1301, 1309 (10th Cir. 2000) (applying Utah law) ("The

rule prohibits acting as counsel at trial when the attorney is likely to be a necessary witness")

(emphasis in original).  This early in the case – particularly where the pleadings themselves

require clarification and refinement – attempting to divine those issues that will actually be

contested at a trial that is months or years away likely requires more prognostication than the

court can provide.  *See id.* ("this motion to disqualify counsel is at best premature . . . there

seems little chance that the subject matter of counsel's affidavit will be the subject of a trial").

The more conservative course of action for the Magistrate Judge would have been to deny the

motion without prejudice or defer ruling on it until the scope of the issues to be addressed at trial

– and, concomitantly, the extent to which the Plaintiffs' counsel's knowledge of the facts would

be both relevant and contested – became clearer.

That being said, the notion that the Plaintiffs' counsel might be percipient witnesses does pose challenges that could arise prior to trial.  Most significantly, the Defendants may wish to depose one or both of the Plaintiffs' counsel to ascertain and preserve their recollection of the events in dispute.  It is also conceivable that pretrial evidentiary hearings may touch on the issues on which the Plaintiffs' counsel have percipient knowledge, making it necessary to grapple with the disqualification issue again.  *See generally U.S. v. Evanson*, 584 F.3d 904, 909 (10th Cir. 2009) (explaining that "the problem [is that] the attorney might convey first-hand knowledge of the events without having to swear an oath or be subject to cross-examination").  Nevertheless, this Court is not convinced that the disqualification issue cannot be skirted for the present time through deft handling of pretrial issues.  For example, if the Plaintiffs' counsel will voluntarily consent to sit for a deposition (or the parties can reach some other stipulation for obtaining that testimony), this particular facet of the issue can be resolved short of disqualification.  The parties or the Court may be able to carefully define and circumscribe the scope of evidentiary hearings to either ensure that the subject matter within the Plaintiffs' counsel's alleged knowledge is not broached or, if the issue cannot be avoided, it may be appropriate to disqualify the Plaintiffs' counsel solely for purposes of that hearing, not for the entirety of the case.  *See e.g. American Plastic Equipment, Inc. v. Toytrackerz, LLC*, 2009 WL 902424 at *7 (D. Kan. Mar. 31, 2009) (unpublished) (court crafting limited disqualification that permitted attorney-witness to participate in drafting pleadings and arguing non-evidentiary motions, among other things).

### 3.  Necessity of counsel's testimony

Even if the Court were to reach the merits of the motion, the Court also has some disagreement with the Magistrate Judge's conclusion that the Plaintiffs' counsel will <u>necessarily</u> be called as witnesses in this case.  This Court's review of the record strongly suggests that, not withstanding Aurora's protestations, there is no material dispute of fact regarding the accommodation that Mr. Grider was offered.

Aurora's motion contended that the Plaintiffs' attorneys contacted Aurora's Deputy City Attorney to address a citation that had been issued to Mr. Grider.  After discussions, the parties reached an agreement to the effect that Mr. Grider would submit his dog to Aurora's Animal Care Division for an inquiry into its status as a service dog, and, if the dog was found to be appropriately trained as a service animal, Aurora would permit Mr. Grider to retain the dog, perhaps with certain restrictions.  Ultimately, it is the last clause of the prior sentence – "perhaps with certain restrictions" – that presents the only apparent dispute between the parties.

The Plaintiffs appear to believe that the deal they reached with Aurora was that, if Mr. Grider established the dog's status as a trained service animal, Aurora would allow him to retain the dog without further conditions.  A written stipulation between the parties – that neither party has disputed the existence or authenticity of – seems to conform to this position.  That stipulation states:

> [Mr. Grider] will provide information relating to the status [of the dog] as a service dog.  The City of Aurora will expedite its review of his request.  This information will be provided immediately upon or before execution of this stipulation and the review forthwith.  Further, upon a review by the City of Aurora and determination that [the dog] is a service dog, the office of the City of Aurora's Attorney's Office will forthwith notify other divisions of the City of Aurora as to the status of [the dog] as a service dog.

18

> Upon that determination, the City of Aurora will forthwith permit
> the return of Plaintiff Grider's dog . . . .

By contrast, Aurora appears to have understood the agreement to provide that, if Mr. Grider's dog was found to be a service animal, Mr. Grider would be able to retain the dog <u>so long as he complied with the remaining requirements</u> of the Aurora ordinance.  Among other things, that ordinance would require Mr. Grider to: (i) provide proof that the dog had been spayed and vaccinated, (ii) provide proof that he carried insurance conforming to certain requirements; (iii) use a specific kind of leash and a muzzle on the dog when in public; and (iv) conform to certain requirements when leaving the dog unleashed in his yard.  Although the stipulation does not expressly condition Mr. Grider's retention of the dog upon these conditions, one might reasonably argue that compliance with those portions of the ordinance that would not appear to interfere with Mr. Grider's use of the dog as a service animal is an implicit condition of the parties' agreement.

In short, it appears that the only factual dispute between the parties – and thus, the issue that the Plaintiffs' counsel are potentially witnesses with regard to – is whether they discussed or agreed to Mr. Grider's compliance with the remaining portions of the ordinance as a condition of allowing Mr. Grider to retain his dog.  But even this dispute appears to be ultimately immaterial to the question of whether Aurora actually offered a reasonable accommodation for Mr. Grider.  The legal question implicated by the parties' discussions is whether Aurora offered Mr. Grider an accommodation that was reasonable.  That question is informed by the reasonableness of the accommodation that Aurora <u>actually</u> offered, not the terms of other accommodations that Aurora <u>could have</u> offered.  Taking, for the moment, the Plaintiffs' view of the discussions, the fact that Aurora may have changed its mind about the terms of the accommodation after Mr. Grider

performed his end of the bargain might be important if this case sounded in breach of contract, but Aurora's change of heart is of no significance in a case that is focused solely on the accommodation that was ultimately offered.  Because the parties do not dispute the terms of Aurora's ultimate proposal to accommodate Mr. Grider – those terms are set forth in the stipulation and supplemented by a March 18, 2010 letter from Aurora Animal Control to Mr. Grider iterating the remaining requirements of the ordinance – this Court cannot conclude that there is a dispute of fact on the question of what Aurora's proposed accommodation entailed. Accordingly, and contrary to the Magistrate Judge's finding, this Court is not convinced that the Plaintiffs' counsel are necessary witnesses.

Thus, the Plaintiffs' Objections to the Magistrate Judge's Order are sustained, the Court vacates that Order, and Aurora's Motion to Disqualify is denied without prejudice.

## **CONCLUSION**

For the foregoing reasons, Denver's Motion to Dismiss **(# 31)** and Aurora's Motion for Judgment on the Pleadings **(# 39)** are **GRANTED**, subject to the Plaintiffs being granted leave to file an Amended Complaint within 30 days of the date of this Order.  Should the Plaintiff elect not to file an Amended Complaint within that time, the Complaint shall be dismissed and the case closed without further Order.  Mr. Kelley's Motion to Dismiss **(# 31)** is **GRANTED**, the claims against Mr. Kelley in both his individual and official capacities are **DISMISSED**, and the caption of this case shall be amended to omit reference to Mr. Kelley.  The Plaintiffs' Objections

(# **71**) are **SUSTAINED**, and the October 25, 2010 Order (# **67**) of the Magistrate Judge is

**VACATED**. Aurora's Motion to Disqualify (# **52**) the Plaintiffs' counsel is **DENIED** without

prejudice.

      Dated this 23d day of February, 2011

                                  **BY THE COURT:**

                                  Marcia S. Krieger
                                  United States District Judge