IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 10-cv-00722-MSK-MJW

ALLEN GRIDER;
GLENN BELCHER;
VALERIE PILTZ; and
LUIGI FRANCIS SHORTY ROSSI,

        Plaintiffs,

v.

CITY AND COUNTY OF DENVER; and
CITY OF AURORA,

        Defendants.

_____

OPINION AND ORDER GRANTING, IN PART, MOTIONS TO DISMISS
_____

**THIS MATTER** comes before the Court pursuant to Defendant City of Aurora's Motion to Dismiss **(# 89)**, the Plaintiffs' response **(# 95)**, and Aurora's reply **(# 96)**; and Defendant City of Denver's Motion to Dismiss **(# 90)**, the Plaintiffs' response **(# 94)**, and Denver's reply **(# 97)**.

## FACTS

The operative pleading is the Amended Complaint **(# 85)**. It alleges that both Denver and Aurora maintain municipal bans on the possession of pit bulls. Specifically, both cities maintain municipal ordinances that make it "unlawful for any person to . . . own, possess, keep, [or] transport . . . within the city any pit bull." Each of the Plaintiffs claim to be disabled individuals protected by the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and each uses a pit bull as a service animal to assist them with their tasks of daily living. They contend that the restrictions on their keeping of their animals within Aurora and Denver have deprived

them of the ability to use the dogs for their assistive purposes.

The Plaintiffs assert three causes of action: (i) a claim under Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, that the Defendants have discriminated against them on the basis of their disabilities, insofar as the ordinances "deny[ ] Plaintiffs the benefits of the services, programs, and activities" of the cities; (ii) failure to accommodate, in violation of the ADA and 28 C.F.R. §35.130(b)(7), in that the Defendants refused to modify the ordinances "as necessary to avoid discrimination on the basis of disability"; and (iii) a claim that the ordinances violate a "right to travel," apparently under the U.S. Constitution.

The Defendants move **(# 89, 90)** to dismiss the Plaintiffs' claims, arguing: (i) with regard to the discrimination claim, the Plaintiffs have failed to allege the necessary statistical facts necessary to make a *prima facie* showing of a disparate impact claim[1]; (ii) with regard to the failure to accommodate clam, the Defendants contend that the Plaintiffs fail to adequately identify any municipal services or programs to which they were denied access as a result of the ordinances, and that they fail to identify the alleged reasonable accommodation they claim to be entitled to; and (iii) with regard to the right to travel claim, the Plaintiffs do not allege facts showing that the ordinances interfere with the Plaintiffs' right to <u>interstate</u> travel.

## ANALYSIS

### A. Standard of review

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party. *Stidham v. Peace Officer Standards and Training*, 265 F.3d

---

[1]The Court understands the Plaintiffs to concede that they cannot demonstrate purposeful discrimination by the Defendants, as would be necessary to support a discrimination claim premised on disparate treatment.

1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). The Court must limit its consideration to the four corners of the Amended Complaint, any documents attached thereto, and any external documents that are referenced in the Amended Complaint and whose accuracy is not in dispute. *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

A claim is subject to dismissal if it fails to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). To make such an assessment, the Court first discards those averments in the Complaint that are merely legal conclusions or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 1949-50. The Court takes the remaining, well-pled factual contentions as true and ascertains whether those facts (coupled, of course, with the law establishing the requisite elements of the claim) support a claim that is "plausible" or whether the claim being asserted is merely "conceivable" or "possible" under the facts alleged. *Id.* at 1950-51. What is required to reach the level of "plausibility" varies from context to context, but generally, allegations that are "so general that they encompass a wide swath of conduct, much of it innocent," will not be sufficient. *Khalik v. United Air Lines*, ___ F.3d ___, 2012 WL 364058 (10th Cir. 2012) (slip op.).

### B. Disparate impact claim

The Plaintiffs' responses to the Defendants' motions clarify that the Plaintiffs intend their disability discrimination claims to be construed as disparate impact claims. Disparate impact claims are those in which an entity employs policies or regulations "that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another."

*Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003). Unlike disparate treatment claims, disparate impact claims do not require an examination of the subjective intent of a defendant to discriminate. *Id.* Disparate impact claims are cognizable under the ADA. *Id.*, citing 42 U.S.C. § 12112(b).

To sufficiently plead a claim of disability discrimination under a disparate impact theory, the Plaintiffs must allege: (i) the existence of a facially-neutral policy or practice by the Defendants; and (ii) facts showing that that policy or practice has a significantly adverse or disproportionate impact on persons of a particular type.[2] *Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565, 574-75 (2d Cir. 2003). The parties agree that the ordinances in question satisfy the first element; the dispute in this case concerns whether the Plaintiffs have adequately demonstrated the second element.

To satisfy the second element, the Plaintiffs must allege facts showing that the Defendants' policies impose "a significantly adverse or disproportionate impact on a protected group of individuals." *Id.* at 575. Ordinarily, such a showing is made by identifying "statistical evidence [showing] disparity in outcome between groups." *Id.* For example, in *Tsombanidis*, the plaintiffs were recovering alcoholics desiring to live together in a group home, but city zoning ordinances prohibited large numbers of unrelated persons from living together in a residential area. The plaintiffs brought an ADA disparate impact claim against the city, arguing that their status as recovering alcoholics rendered them disabled under the ADA, and that the group living arrangement was an important part of their therapeutic regimen, whereas non-disabled individuals did not share a similar need for group living. *Id.* at 575. The trial court concluded

---

[2] If the Plaintiffs carry their burden, the Defendants thus assume a burden to show that the policy or practice "furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Id.*

that this adequately satisfied the second element of the disparate impact claim, but the Second Circuit reversed. As the appeals court explained, the trial court "merely required the plaintiffs to show they could not live in the house they desired because of the code and that plaintiffs needed this type of housing due to their handicap." *Id.* at 576. This, it explained, "is not sufficient for disparate impact purposes." *Id.* Rather, the plaintiffs were required to show "that a significant number of people suffering the handicap need group living and that the fire code restricts a substantial portion of similarly handicapped individuals from doing so." *Id.* The court explained that the proper way to make this comparison was to compare the number of recovering alcoholics desiring to live in group homes with the number of persons desiring to live in group homes who were not recovering alcoholics, and ascertain whether the former group was significantly greater than the latter. *Id.* at 577.

Applying the teachings of *Tsombanidis* to this case, in order to adequately allege the second element of a disparate impact claim, the Plaintiffs must allege facts showing that the number of disabled individuals desiring to keep a pit bull for use as a service animal is significantly greater than the number of non-disabled individuals desiring to keep a pit bull. The Plaintiffs do not do so: they do not identify, except in the most general terms, the existence of any other disabled individuals using pit bulls as service animals (much less attempt to quantify the number of affected individuals) and they offer no estimate whatsoever as to the number of non-disabled individuals affected by the ordinances. Thus, they have failed to make the quantitative showing required to plead a disparate impact claim.

*Tsombanidis* also acknowledges that the second element of a disparate impact claim can be satisfied by a qualitative showing instead. Framed in the context of that case, it explained that such a showing would be that "the average recovering [alcoholic] in West Haven has a greater

need – qualitatively – for group living than does the average non-recovering resident." *Id.* at 577. It proceeds to explain that "[t]his would likely require some quantification of what each group 'needs' from a living arrangement standpoint," from which the court might then conclude that "there is a qualitatively disproportionate impact on recovering [alcoholics] in West Haven." *Id.* The court in *Tsombanidis* observed that the plaintiffs there "seem to have taken the qualitative track," but that they "have not shown any proof that there are other recovering [alcoholics] in West Haven who need group living of seven or more or any proof about non-recoverings' needs." *Id.*

Similarly, here, the Plaintiffs appear to rely on a qualitative showing that they are disproportionately impacted by the ordinances. The Plaintiffs' response briefs argue that "a service dog is irreplaceable and is something a disabled person cannot live without," whereas "a non-disabled person with a pit bull as a pet, while it may be very dear to them, has much more flexibility."

This argument suffers from several flaws. First, and most notably, there are no factual assertions whatsoever in the Amended Complaint on this point; the Amended Complaint makes no allegations whatsoever – qualitative or quantitative – about persons who might keep pit bulls as pets.[3]

Second, the argument is somewhat inconsistent with the allegations already in the Amended Complaint. Although the Plaintiffs argue that their dogs are "irreplaceable" and "something [they] cannot live without", the Amended Complaint states that Mr. Rossi can avail himself of a cane to provide some of the mobility assistance that his service dog offers (albeit

---

[3] The term "pets" is used in the Amended Complaint only when referencing how the ordinances' requirements fall more harshly on the Plaintiffs as compared to the utterly irrelevant group of "people without pets." *Docket # 85, ¶ 50, 51, 53.*

with the acknowledgment that the cane does not offer the full range of assistance that the dog provides), and that Mr. Grider somehow managed to continue to function despite the fact that his dog was confiscated for a period of five months. Thus, the Amended Complaint itself suggests that, at least in some respects, the loss of access to their dogs does not prevent the Plaintiffs from functioning.

Third, the Plaintiffs appear to underestimate the degree to which non-disabled individuals might derive therapeutic value from the companionship of a pet. The Amended Complaint describes types of tasks that service animals perform, including "assisting individuals who are blind or have low vision with navigation and other tasks, alerting individuals who are deaf or hard of hearing to the presence of people or sounds, providing non-violent protection, . . . retrieving items such as medicine or the telephone, . . . . and helping persons with psychiatric or neurological disabilities by preventing or interrupting impulsive or destructive behaviors." Within these parameters, the Court can readily conceive of individuals who, while not meeting the legal definition of having a disability, nevertheless rely on the family pet in some of the same ways (if not necessarily to the same degree) as the Plaintiffs do. It would hardly be surprising that people with non-disabling hearing difficulties might rely on their family pet to help indicate the presence or location of sounds, or for a family with small children to rely on the natural instincts of the family dog to shepherd the children away from stairwells and other dangerous areas. The Amended Complaint states that Mr. Belcher's dog is trained to recognize when Mr. Belcher is having an episode of Post-Traumatic Stress Disorder or an anxiety attack and to assist him when this occurs. A non-disabled person who is nevertheless prone to panic or anxiety attacks might similarly rely on their own dog in the same way – even an untrained pet might become familiar with its owner's emotional states and learn to provide calming attention when

their owner becomes irritated or anxious. Elderly yet non-disabled persons with diminished agility might rely on a faithful dog for mobility assistance like Mr. Rossi relies upon his trained service dog to assist him in maintaining balance and recovering from a fall, or in the same way that Mr. Belcher relies upon his service dog to carry items for him. In these situations, if the family dog is also a pit bull, the ordinance affects these non-disabled individuals in much the same way that they affect the Plaintiffs.

Thus, because the Amended Complaint does not contain allegations sufficient to plausibly demonstrate that the ordinance significantly affects disabled persons in a qualitative or quantitative way differently than it affects non-disabled persons, the discrimination claims in the Amended Complaint are dismissed.

### C. Accommodation claim

The Plaintiffs' ADA claims are brought under Title II of that act, which provides that no disabled person "shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. (Although the terms "services, programs, or activities" are not defined by the ADA, courts have understood that term to mean "all of the operations of a local government." *Frame v. City of Arlington*, 657 F.3d 215, 225 (5th Cir. 2011).) Where a person's disability has the effect of depriving them of access to a municipality's services, the municipality is under an obligation to make reasonable accommodations to overcome the disability if possible. *See Henrietta D v. Bloomberg*, 331 F.3d 261, 273-74 (2d Cir. 2003).

To plead a claim under a failure to accommodate theory, the Plaintiffs must allege facts showing that: (i) they are disabled under the ADA; (ii) due to that disability, they are being denied the benefits of local government operations; (iii) there is a reasonable accommodation

that could be made by the municipality that would permit them to enjoy such benefits; and (iv) they have sought that accommodation from the municipality and have been denied. *See generally Tsombanidis*, 352 F.3d at 578-79; *Henrietta D*, 331 F.3d at 272-280. A "reasonable accommodation" is one whose "costs, facially, do not clearly exceed its benefits," *Henrietta D*, 331 F.3d at 280, and one which would not otherwise "fundamentally alter the nature of the service, program, or activity." *Falchenberg v. New York State Dept. of Education*, 338 Fed.Appx. 1, 13 (2d Cir. 2009) (unpublished).

The Defendants do not dispute that the Plaintiffs are disabled individuals, but assert that there are insufficient allegations in the Amended Complaint for the remaining elements of this claim.

Turning first to the question of whether the Plaintiffs have adequately pled that they were denied access to the benefits of local government operations, all four Plaintiffs allege that the ordinances prevent them from "walking on public streets [and] being in a public park," and two Plaintiffs additionally allege that they are unable to summon emergency responders to their house out of fear that their possession of a prohibited breed dog will result in prosecution. The Court has profound doubts, that these largely conclusory and speculative allegations, if proved would establish the second element of a failure to accommodate claim. Nevertheless, at the pleading stage of the litigation, the Court cannot say that, as a matter of law, dismissal is necessary. The Plaintiffs allege that their disabilities require them to avail themselves of service animals to navigate public areas, and that the ordinances effectively deny them the ability to use their service animals in public.[4] This is enough – although perhaps barely enough – to allow the

---

[4] The Court observes that Mr. Grider alleges that Aurora proposed an accommodation by which Mr. Grider could continue to keep and use his dog, albeit subject to several restrictions (including using a leash and muzzle on the dog at all times outside the house, securing additional

matter to proceed.

Next, both Defendants allege that the Plaintiffs have failed to identify the reasonable accommodation(s) they require in order to be able to access public services. *See generally Mershon v. St. Louis University*, 442 F.3d 1069, 1077 (8th Cir. 2006) (plaintiff bears the initial burden of identifying the requested accommodation). The Amended Complaint clearly identifies the accommodations proposed by Mr. Grider and Mr. Belcher – in both cases, they identify "a reasonable accommodation of exempting service dogs . . . from the provisions of [the] restricted breed ordinance." There are no similar allegations that Plaintiffs Piltz and Rossi, but given the nature of this case, the Court will assume that those Plaintiffs similarly allege that a reasonable accommodation in the form of an exemption to the ordinances for pit bulls trained as service dogs is requested.

Finally, the last element of a failure to accommodate claim requires the Plaintiffs to plead that they requested such an accommodation from the Defendants and that they were denied. The allegations in the Amended Complaint, when taken in the light most favorable to the Plaintiffs, are sufficient to suggest that Plaintiffs Grider, Belcher, and Piltz made such requests to the Defendants,[5] but the Amended Complaint gives no indication that Mr. Rossi ever requested an accommodation from either Defendant. Accordingly, Mr. Rossi has failed to state a claim for

---

property insurance coverage, posting signs about the dog on his property, among others). Mr. Grider alleges that those restrictions are themselves prohibited by the ADA, and the Court need not address that contention at this time. However, if permissible, such restrictions would apparently allow Mr. Grider to access all of Aurora's public services.

[5]The Court recognizes that some Plaintiffs assert claims only against their home municipality and recite requests for accommodation made to that municipality. For example, Mr. Grider's allegations only concern Aurora, not Denver; Mr. Belcher refers only to Denver, not Aurora. The Court assumes that these Plaintiffs are limiting their claims to only the jurisdictions specifically identified in the Amended Complaint.

failure to accommodate, and his claim is dismissed.

### D. Travel claim

The Plaintiffs' right to travel claim is somewhat ill-defined. The exceedingly brief portion of the Amended Complaint addressing this claim seems to suggest that the claim is exclusively rooted in the U.S. Constitution, citing *U.S. v. Guest*, 383 U.S. 745 (1966), and appears to contend that the ordinances "restrict[ ] travel by an individual with a disability who uses a breed that is acceptable . . . in the individual's home jurisdiction but is nonetheless banned by other jurisdictions."

The Plaintiffs' response to the Defendants' motions instead focus first on a contention that the ordinances violate C.R.S. § 24-9-204.5(5), in that municipalities are prohibited by state law from enacting legislation restricting dog breeds, and thus "any restrictions on transporting pit bulls . . . are unlawful under Colorado law." The Court finds nothing in the Amended Complaint that would purport to assert a claim that municipal breed restrictions are prohibited under Colorado law, and thus, the Court rejects this argument.

Next, the Plaintiffs argue that "The ADA does not require any sort of permit or documentation at any time," and thus "even having to get a permit to temporarily travel [with a pit bull] is in violation of the ADA. This claim, too, does not appear to be invoking the constitutional guarantee of free travel described by the Amended Complaint.

Finally, the Plaintiffs make a passing argument consisting entirely of: (i) a declarative sentence that the Plaintiffs were denied their constitutional right to travel with their animals; (ii) an assertion, apparently without citation, that "the right to travel is a guaranteed right"; and (iii) two sentences, apparently quoted from *Kent v. Dulles*, 357 U.S. 116, 125-126 (1958), for the proposition that "freedom of movement across frontiers in either direction and inside our

frontiers" is "deeply engrained in our history" and "part of our heritage." The Plaintiffs make no attempt to identify the elements of a claim for violation of the right to travel, nor analyze their allegations in light of such elements.

The "right to travel" recognized by the U.S. Supreme Court encompasses three aspects: (i) it protects "the right of a citizen of one State to enter and leave another State" – that is, the ability of citizens "to cross state borders while traveling from one place to another"; (ii) the right to enjoy the privileges and immunities that the destination state confers on its own citizens, free of "discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States"; and (iii) the right of newly-arrived citizens to the privileges and immunities that longstanding citizens of the state enjoy – that is "the right to be treated equally in her new state of residence." *Saenz v. Roe*, 526 U.S. 489, 500-05 (1999). The latter two rights are not arguably at issue here: the Plaintiffs do not contend that the Defendants treat their own residents with pit bulls more favorably than they treat travelers (disabled or otherwise) or newly-arrived citizens (disabled or otherwise) with pit bulls. Thus, a right to travel claim, if any, must derive from the first aspect of the right – the right to cross state borders.

Cases such as *U.S. v. Guest* make clear that this component of the right to travel is largely limited to embodying a right to be free of state-created impediments that directly restrain or burden an individual's ability to travel across state lines. *Guest* itself is not particularly on-point,[6] but it collects cases such as *Crandall v. State of Nevada*, 73 U.S. 35 (1867), which

---

[6] *Guest* involved federal authorities relying on the interstate commerce clause to bring federal criminal charges against individuals who conspired to commit racially-motivated attacks on persons in Athens, Georgia. By including an allegations that such conduct impinged upon the victims' "right to travel freely to and from the state of Georgia and to use highway facilities and other instrumentalities of commerce," prosecutors were able to convert a geographically local

invalidated a state departure tax imposed on those leaving the state, and *Edwards v. California*, 314 U.S. 160 (1941), invalidating a state criminal statute that prohibited the transport of indigents into the state. These cases make clear that the prohibited burden is one that activates upon the traveler's crossing of a state boundary, a situation that is not alleged here.

The Court is aware of, and the Plaintiffs certainly cite to, no precedent suggesting that this aspect of the right to travel is infringed by a state or municipal law of general applicability that simply prohibits possession of a certain item within the local jurisdiction. To hold otherwise would allow the constitutional right to travel to negate local laws prohibiting, say, possession of firearms or medical marijuana, so long as the traveler could legally possess those items at home.[7] *See generally Bach v. Pataki*, 408 F.3d 75, 86 (2d Cir. 2005) (right to travel not implicated by state law restricting firearm possession where traveler could legally possess the firearm in his home state).

Accordingly, the Court finds that the Amended Complaint fails to state a cognizable claim premised on the right to travel, and thus, the Plaintiffs' third claim is dismissed.

## CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss (# 89, 90) are **GRANTED IN PART**, insofar as the Plaintiffs' first claim (disability discrimination) and third claim (right to travel) are **DISMISSED** under Fed. R. Civ. P. 12(b)(6), as are all claims by Plaintiff Rossi, and **DENIED IN PART**, insofar as the Court finds that the remaining Plaintiffs

---

one into a federal offense.

[7]Certainly, the Supremacy Clause of the U.S. Constitution allows federal laws to trump local laws regarding certain matters. The Plaintiffs could be heard to argue that the ADA, as a federal law, thus trumps the local ordinances. But this argument drifts away from grounding a claim in the constitutional right to travel, and thus, is unhelpful to the Plaintiffs in preserving the right to travel claim here.

have adequately pled a claim for failure to accommodate under the ADA. The caption of this case is **AMENDED** to omit reference to Mr. Rossi.

Dated this 30th day of March, 2012

**BY THE COURT:**

_____

Marcia S. Krieger
United States District Judge